UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Cee A.J. Williams,

                    Plaintiff,                    07-CV-5329 (CPS)

     - against -
                                                  MEMORANDUM OPINION
The Delta Family-Care Disability and              AND ORDER
Survivorship Plan, the Delta Family-Care
Medical Plan, the Delta Family-Care
Dental Plan, the Delta Family-Care Life
Insurance Plan, and the Administrative
Committee of Delta Airlines, Inc.,

                    Defendants.

----------------------------------------X

SIFTON, Senior Judge.

        Plaintiff Cee A.J. Williams ("Plaintiff") brings this action

against defendants the Delta Family-Care Disability and

Survivorship Plan, the Delta Family-Care Medical Plan, the Delta

Family-Care Dental Plan, the Delta Family-Care Life Insurance

Plan, and the Administrative Committee of Delta Airlines, Inc.

(the "Administrative Committee").[1]  Plaintiff claims that

defendants' termination of her disability income benefits, as

well as her medical, dental and life insurance coverage, violated

the terms of the various Delta employee benefit plans, and she

seeks to recover these benefits pursuant to the Employee

_____

        [1] Defendants maintain that the Delta Family-Care Dental Plan and the
Delta Family-Care Life Insurance Plan do not exist, although dental benefits
are available under the Delta Family-Care Medical Plan and basic life benefits
are available under the Delta Family-Care Disability and Survivorship Plan.
*See* Defendants' Answer to the Complaint dated January 23, 2008; Declaration of
Suzanne M. Arpin ("Arpin Decl.") ¶ 5.

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

1001 *et seq*. Presently before this Court are plaintiff's and

defendants' cross motions for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure. For the reasons set

forth below, defendants' motion is granted and plaintiff's cross-

motion is denied.

## BACKGROUND

The following facts are drawn from the parties' papers

submitted in connection with this motion. Disputes are noted.

Plaintiff was employed by Delta Air Lines, Inc. ("Delta")

for over 25 years, from October 28, 1968, to December 18, 1993,

as a passenger or customer service agent.[2] Complaint filed

December 21, 2007 ("Compl.") ¶¶ 12-13; Affirmation of Paul M.

Kampfer, Esq. ("Kampfer Aff."), Ex. B at AJW00033, AJW00153.[3]

Plaintiff's duties included providing a variety of personal

services to airline passengers, including assisting elderly and

minor passengers with intra-airport travel and baggage claim.

Compl. ¶ 13; *see also* Plaintiff's Affidavit in Support of Her

Motion for Summary Judgment ("Pl.'s Aff.") ¶ 6.

On December 18, 1993, plaintiff was driving to her place of

---

[2] The parties dispute plaintiff's title while she was employed by Delta, plaintiff contending that she was a "passenger service agent" and defendants asserting that she was a "customer service agent." The distinction, however, is immaterial.

[3] References hereinafter to "AJW00___" pertain to Ex. B of the Kampfer Aff., which contains the administrative record relating to this case.

work at John F. Kennedy International Airport in Queens, New York, when she swerved into oncoming traffic to avoid hitting a pedestrian. Pl.'s Aff. ¶¶ 16-17. Her car collided with another vehicle. *Id.* ¶ 17. The impact was so severe that plaintiff lost consciousness and had to be extracted by emergency response personnel. *Id.* ¶ 18. Plaintiff sustained injuries to the left side of her body, which was crushed, and suffered facial lacerations and lost teeth. The force of the impact caused plaintiff to bite off her lower lip. In addition, plaintiff sustained a lower back sprain, a crush injury of the left foot, internal derangement of both knees and a hernia to her left thigh. *Id.* ¶¶ 18-19. Between October of 1994 and December of 1997, plaintiff underwent at least six surgeries to address her injuries, including reconstruction of her lower lip and multiple operations on her knees. *Id.* ¶ 21.

Following the December 18, 1993 automobile accident, plaintiff applied for disability benefits under the Delta Family-Care Disability and Survivorship Plan (the "Disability Plan"). *Id.* ¶ 28. The Disability Plan is a non-contributory employee welfare benefit plan established and maintained pursuant to ERISA. Declaration of Suzanne Arpin ("Arpin Decl."), Ex. A at 86DP024, 86DP067.[4] The Disability Plan provides both short- and

---

[4] References hereinafter to "86DP___" pertain to Ex. A of the Arpin Decl., which contains a copy of the applicable version of the Disability Plan.

long-term disability benefits to non-pilot Delta employees.
86DP039, 86DP043-44, 86DP048, 86DP055.  Section 4.02 of the
Disability Plan provides for short-term disability benefits when
an eligible employee is "disabled as a result of a demonstrable
injury . . . which prevents the Employee from engaging in the
Employee's customary occupation."  86DP043.  Section 4.03
provides for long-term disability benefits upon expiry of short-
term benefits, if an eligible employee is "disabled at that time
as a result of a demonstrable injury . . . which will
continuously and totally prevent him [or her] from engaging in
any occupation whatsoever for compensation or profit, including
part-time work[.]"  86DP044.  Section 4.01 sets forth additional
eligibility criteria and states, in relevant part, that "[a]n
Employee who is eligible for disability benefits under the Plan
shall be eligible for such benefits only so long as [s]he is
under the care of a physician or surgeon for the injury . . .
which is the disabling condition."  86DP043.  If an employee is
receiving disability benefits under the Disability Plan, the
employee is generally entitled to received medical and dental
benefits as well as life insurance.  Compl. ¶¶ 8, 88; Defendants'
Response to Plaintiff's Rule 56.1 Statement at 3-4; Arpin Decl.
¶ 5.

Section 11.01 of the Disability Plan provides that the
Administrative Committee shall be the named fiduciary of the Plan

for purposes of the Plan's operation and administration, with the exception of responsibility for investment and control of Plan assets.  86DP070.  Sections 11.01-02 also state that the Administrative Committee has the exclusive power to interpret the Plan and to carry out its provisions, including decisions relating to employee eligibility.  86DP070-72.  According to Section 11.03, the Administrative Committee's decisions "as to interpretation and application of the Plan shall be final." 86DP072.

Delta does not directly contribute any monies to the Disability Plan.  86DP067-68.  The only monies indirectly provided to the Disability Plan by Delta are placed into various related trust funds and insurance contracts (the "Benefit Fund"), which cannot revert back to Delta.  *Id*.  All contributions to the Benefit Fund must be used exclusively for the benefit of Disability Plan participants and reasonable Plan administration expenses.  86DP068.  For the Plan year ended June 30, 2003, the Benefit Fund had over $377,576,000.00 in assets and paid out $49,048,000.00 in benefits.  Arpin Decl. ¶ 6.  At the time the benefit decision at issue here was made, the Administrative Committee had no responsibility or control over the Benefit Fund. *Id.* ¶ 7.

Plaintiff's application for short-term disability benefits under the Disability Plan was approved, and she received short-

term benefits from the Plan for six months. *Id*. ¶ 29; AJW00451.
Plaintiff's claim for long-term benefits was thereafter initially
approved, and she received long-term benefits beginning on June
19, 1994. Pl.'s Aff. ¶ 30; AJW00449. On April 4, 1995,
plaintiff was denied long-term disability benefits effective
February 1, 1995, on the grounds that the Disability Plan had not
received required documentation from plaintiff's treating
physician. Pl.'s Aff. ¶ 31; AJW00446. Plaintiff appealed this
decision in May of 1995, Pl.'s Aff. ¶ 31, AJW00442, and the
denial was upheld by letter dated August 29, 1995 from the
Administrative Subcommittee of the Disability Plan. AJW00437.
Plaintiff appealed the Administrative Subcommittee's decision to
the Administrative Committee in November of 1995, Pl.'s Aff ¶ 33,
AJW00419, and by letter dated May 23, 1996, the Administrative
Committee upheld the denial on the grounds that plaintiff's
appeal was received outside the prescribed time period for
appeals. Pl.'s Aff. ¶ 34, AJW00419.

On May 19, 1996, the United States Social Security
Administration determined that plaintiff had become disabled
under its rules on December 18, 1993. AJW00239-42. In its May
19, 1996 Notice of Award, the Social Security Administration
granted monthly disability benefits to plaintiff beginning in
January of 1995. *Id.*

Plaintiff thereafter instituted a lawsuit against the

Disability Plan and the Administrative Committee in this Court, seeking reinstatement of benefits under the Disability Plan. Pl.'s Aff. ¶ 35. The lawsuit was settled, and the Administrative Committee agreed to review plaintiff's appeal of the benefits denial. *Id.* ¶ 36. Following its review, by letter dated December 22, 2000, the Administrative Committee reversed the denial of benefits and conferred retroactive long-term disability benefits on plaintiff in the amount of $56,228.78, to cover the period from February 1, 1995 to May 31, 1999. *Id.* ¶ 37; AJW00233-34; AJW00252-53. The Administrative Committee conditioned approval of benefits post-May 1999 on receipt of medical documentation that claimant remained "completely and totally disabled" and "under the care of a physician for her condition." AJW00252.

On February 27, 2001 and on April 5, 2001, the Disability Plan wrote to counsel for plaintiff and plaintiff, respectively, stating that in order to avoid a denial of benefits effective June 1, 1999, it required medical reports from plaintiff's treating physician from that date forward. AJW00232-34. By letter dated May 3, 2001, plaintiff was denied disability benefits effective June 1, 1999 on the grounds that the Disability Plan had never received the required medical reports. AJW00228-29. Plaintiff requested review of this decision in a May 9, 2001 letter. AJW00206.

By letter dated August 24, 2001, plaintiff provided the Disability Plan with medical records from the physician treating plaintiff for the injuries causing her disability, Dr. Michael Soojian, M.D., an orthopedic surgeon. AJW00160-85; AJW00084. Plaintiff also provided medical records from Dr. Martin L. Schneider, who treated plaintiff for a lump in her breast in 2000, explaining that because plaintiff did not receive retroactive benefit payments from the Disability Plan until February of 2001, she could only afford to seek treatment from Dr. Schneider for the lump in her breast in 2000.

The records from Dr. Soojian, plaintiff's treating physician, included a December 27, 1999 Statement to the New York Office of Temporary and Disability Insurance and "office notes" dated February 1, 2001 and June 28, 2001. AJW00160-65. The December 27, 1999 Statement by Dr. Soojian contained the following conclusions:

> Patient has great difficulty ambulating. R Knee ROM ["range of motion"] 0-100°. L Knee 0-120° with medial lateral joint line Pain. Patient is unable to walk continuously for more than 10 minutes. Patient cannot sit or stand continuously in excess of 10-15 min. Patient cannot lift or carry weight 5 lbs – time 10 min. Patient remains with constant pain. Her prognosis is guarded. Patient is totally disabled.

AJW000164. The office note dated February 1, 2001, contains the following observations: "Scar well healed. R Knee ROM 0-110 ↑ ["increased"] pain. L Knee ROM 0-120, medial joint line pain. Disabled." The office note dated June 28, 2001, contains the

following observations: "R knee scar well healed. P -
["Physical finding - "] crepatation. Plan to do (L) Total knee
replacement. Vioxx 250 mg. Disabled." Plaintiff contends, and
defendants dispute, that the office notes were recorded pursuant
to contemporaneous in-office examinations of plaintiff by Dr.
Soojian. Plaintiff's Memorandum of Law in Opposition to
Defendant's Cross-Motion for Summary Judgment ("Pl's. Opp'n
Memo.") at 9; Defendants' Memorandum of Law in Support of
Defendants' Motion for Summary Judgment ("Def.'s Memo.") at 10.
It is undisputed that on January 21, 2002, Dr. Soojian stated in
a report that his last physical examination of plaintiff was on
May 6, 1999. AJW00082.

By letter dated September 20, 2001, the Disability Plan
informed plaintiff that it required an Independent Medical
Evaluation ("IME") of her in order to assess her claim for
disability benefits. AJW00157. On October 10, 2001, plaintiff
was examined by Dr. Herman Ambris, M.D., a practitioner of
physical medicine and rehabilitation, in the presence of Suzanne
Bidart, a nurse employed by counsel for plaintiff. AJW00094-103;
AJW00110-17. According to Dr. Ambris, the examination lasted one
and a half hours, AJW00117, while according to Nurse Bidart, the
examination lasted one hour. AJW00094. In his IME report, Dr.
Ambris made the following observations:

> Based on my objective findings and examination of the
> patient, I do believe that the patient is not totally

disabled as defined by the criteria provided [by the Disability Plan]. I do believe that she is capable of performing some type of work, most appropriately not work related to prolonged standing or lifting; however, work such as light clerical duties or similar work that will permit the patient to sit most of the time or to move around only occasionally. There should be latitude for her being able to take frequent breaks after approximately two or three hours of constant work . . .

[Patient] should be allowed a work station that lets her extend or flex the knees and an adjustable height chair, which would accommodate the pain in her back that she has reported. Her present physical findings do not preclude her from physical work. . . .

Ms. Williams has stated quite impressively that she is very interested in returning to work. Should she be able to manage, she is more than happy to do so. . . .

AJW00116. Nurse Bidart took notes during the examination, in which she recorded plaintiff's statement to Dr. Ambris that she could not sit squarely on her buttocks and needed help getting up from a seated position, AJW00094, as well her statement that she had difficulty walking as far as half a block. AJW00101. Nurse Bidart also states that plaintiff did not simply say that she would like to return to work; rather, she told Dr. Ambris she would like to return to work if she could be pain free. Bidart Decl. ¶ 7.

By letter dated November 21, 2001, the Administrative Subcommittee of the Disability Plan notified plaintiff that it had decided to uphold the denial of benefits effective June 1, 1999. AJW00084-88. Plaintiff appealed this decision to the Administrative Committee in a letter dated February 15, 2002.

AJW00065-73.  Plaintiff's letter enclosed a report from Dr.

Soojian dated January 21, 2002.  AJW00082-83.  In the report, Dr.

Soojian stated that plaintiff had been continuously under his

case since May 3, 1994 up until the date of the report.

AJW00082.  Dr. Soojian also stated the following:

> As of last physical examination of the patient on May 6,
> 1999 the patient is status post right total knee replacement
> surgery and left knee arthroscopic surgery.  The patient has
> a great deal of difficulty with ambulation. . . .
>
> It is my professional opinion that the patient remains with
> a permanent total disability.  She remains with a marked
> loss of function and persistent pain involving both knees.
> The patient is unable to tolerate any type of prolonged
> walking or standing.  She has great difficulty arising from
> a sitting position.  She is unable to kneel, bend, squat,
> twist, climb or run.  Her symptoms have been ongoing for a
> long period of time.  She remains with a guarded prognosis
> and will ultimately require a left total knee replacement in
> the near future.  Resolution of her symptoms is not
> anticipated.

AJW00083.

The Administrative Committee considered plaintiff's appeal

on August 13, 2002.  AJW00001.  By letter of September 9, 2002,

the Administrative Committee notified plaintiff that it had voted

to uphold denial of her disability benefits effective June 1,

1999.  AJW00001-14.  The Administrative Committee based its

decision on two independent grounds: (1) that plaintiff was not

disabled under the definition of the Disability Plan, and (2)

that plaintiff was not under the care of a physician.  AJW00013-

14.  In its deliberations, the Administrative Committee

considered all evidence available to it, including plaintiff's

award of social security disability benefits, Dr. Soojian's various reports and office notes, Dr. Ambris' report of the IME, and Nurse Bidart's notes taken during the IME. AJW00001-14. However, in reaching its decision, the Administrative Committee relied principally on Dr. Ambris' opinion because "it was unclear to the Committee whether [Dr. Soojian] was applying the [Disability] Plan's definition of disability or not" and "because of the questions surrounding whether Dr. Soojian was actually treating and examining Ms. Williams [after May 6, 1999]." AJW00013. The Administrative Committee agreed with Dr. Soojian's conclusion that plaintiff was able to engage in at least part-time work, rendering her not disabled within the meaning of the Disability Plan. *Id.*

On December 21, 2007, plaintiff instituted this action, seeking reinstatement of long-term disability benefits under the Disability Plan. Plaintiff also claims she is entitled to medical and dental benefits as well as life insurance, since these benefits are generally available to those receiving disability benefits under the Disability Plan.

## DISCUSSION

<u>Summary Judgment Standard of Review</u>

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that

supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

Merits of Plaintiff's Claim for Benefits

Plaintiff seeks to enforce her alleged rights under the Disability Plan pursuant to ERISA. Section 1132(a)(1)(B) of ERISA authorizes a suit to enforce rights under the terms of an employee benefits plan. 29 U.S.C. § 1132; *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989).

1.    *ERISA Standard of Review*

A denial of benefits challenged under § 1132(a)(1)(B) of ERISA is "to be reviewed under a de novo standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. Where the written plan documents confer such authority upon a plan administrator, a court confronted with a claim challenging the denial of benefits under ERISA should "not disturb the administrator's ultimate conclusion unless it is 'arbitrary and

capricious.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995); *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir. 1999). In this case, the Disability Plan names the Administrative Committee as fiduciary of the Plan for purposes of the Plan's operation and administration, and confers upon it the exclusive power to interpret the Plan and to carry out its provisions, including any decisions relating to eligibility for benefits. 86DP070-72. The undersigned, as well as other courts in this Circuit, have held that this language is more than sufficient to vest discretionary authority in the Administrative Committee. *Burgie v. Euro Brokers, Inc*., 482 F. Supp. 2d 302, 312 (E.D.N.Y. 2007); *Greenberg v. Unum Life Ins. Co. of America,* No. CV-03-1396*,* 2006 WL 842395, at *6 (E.D.N.Y. 2006); *see also Snyder v. First Unum Life Ins. Co.,* 144 Fed. Appx. 134, 136 (2d Cir. 2005); *Fermanis v. Delta Family Care Disability and Survivorship Plan*, No. 92-CV-866, slip op. at 7 (N.D. Ga. June 4, 1993), *aff'd*, 21 F.3d 1126 (11th Cir. 1994) (table) (holding that broad, discretionary language of the same Disability Plan at issue in this case triggered arbitrary or capricious standard). Accordingly, the arbitrary and capricious standard of review is appropriate here.

In a summary judgment motion, "the arbitrary and capricious standard requires that [the court] ask whether the aggregate evidence, viewed in the light most favorable to the non-moving

party, could support a rational determination that the plan

administrator acted arbitrarily in denying the claim for

benefits."[5] *Davis v. Commercial Bank of New York*, 275 F. Supp.

2d 418, 425 (S.D.N.Y. 2003). The arbitrary and capricious

standard of review is narrow, and a court should not disturb an

administrator's decision unless "it was without reason,

unsupported by substantial evidence or erroneous as a matter of

law." *Pagan,* 52 F.3d at 442. Substantial evidence is "such

evidence that a reasonable mind might accept as adequate to

support the conclusion reached." *Celardo v. GYN Auto. Dealers

Health & Welfare Trust.*, 318 F.3d 142, 146 (2d Cir. 2003). Thus,

the administrator's decision will be upheld so long as it "falls

somewhere on a continuum of reasonableness -- even if on the low

end." *Davis*, 275 F. Supp. 2d at 425. Review under this standard

is based on the record before the administrator at the time of

decision. *Risk v. Long Term Disability Plan of the Dun &

Bradstreet Corp.*, 862 F.Supp. 783, 791 (E.D.N.Y. 1994).

Plaintiff argues that I must consider the fact that the

Administrative Committee was operating under an alleged conflict

---

[5] Courts have grappled with the relationship between the standard of
review at the summary judgment stage and the "arbitrary and capricious"
standard in ERISA cases. However, the fact that the parties have brought
cross-motions for summary judgment in this case "cannot be permitted either to
dilute the teachings of *Firestone* or to undercut the standard of review that
the *Firestone* Court decreed for use in ERISA benefit denial cases. This
respectful standard requires deference to the findings of the plan
administrator, and, thus, even under Fed. R. Civ. P. 56, does not permit a
district court independently to weigh the proof." *Leahy v. Raytheon Co.*, 315
F.3d 11, 18 (1st Cir.2002) (internal citations omitted).

of interest when it denied plaintiff benefits. "If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115 (internal citation omitted); *see also Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (2008) (holding that insurer administering employee benefit plan and paying benefits out of its own pocket operated under conflict of interest, which must be considered as factor in determining whether insurer's decision was abuse of discretion); *accord McCauley v. First Unum Life Ins. Co.*, Nos. 06-5100-cv, 06-5529-cv, 2008 WL 5377680, at *5-6 (2d Cir. Dec. 24, 2008) (applying *Glenn* and reversing prior holding that where administrator operates under conflict of interest and is actually influenced by conflict of interest, *de novo* review applies).

Plaintiff argues that the Disability Plan was operating under a conflict of interest because "the more claims that are approved by the [Administrative] Committee, the more money [Delta] will have to contribute to the Plan, thus reducing Delta's profits." Plaintiff's Memorandum of Law in Support of Her Motion for Summary Judgment ("Pl.'s Memo.") at 8. In this case, however, it is undisputed that disability benefits are paid from the Benefit Fund, which consists of irrevocable payments that cannot revert back to Delta, and over which the

Administrative Committee does not have authority. Unlike the financing structures at stake in *Glenn* and *McCauley,* in which plan administrators both evaluated and paid benefits claims, the funding scheme here does not inherently create a conflict of interest. *Solass v. Delta Family-Care Disability and Survivorship Plan*, No. 05 Civ. 8680, 2005 WL 735965, at \*2 (S.D.N.Y. Mar. 29, 2005) (declining to find conflict of interest in identical funding scheme). Further, it is undisputed that the assets in the Benefit Fund exceeded the total amount of benefits paid during the year in which plaintiff was denied benefits by more than $315,000,000.00. In light of these facts, I find that the Administrative Committee was not operating under a conflict of interest when it denied benefits to plaintiff, and thus I need not consider the alleged conflict of interest as a factor in determining whether there was an abuse of discretion.

2.    *The Weight Given to the IME Physician's Opinion*

Plaintiff sets forth several arguments as to why the Administrative Committee's decision to uphold the denial of her benefits was arbitrary and capricious. First, plaintiff submits that the Administrative Committee's decision was arbitrary and capricious because the Committee gave more weight to the opinion of the IME physician, Dr. Ambris, which plaintiff contends was

unreliable,[6] than to that of plaintiff's treating physician, Dr.

Soojia.  Plaintiff notes that Dr. Ambris only examined her

briefly on one occasion, whereas Dr. Soojian treated her for many

years and had more extensive knowledge of her condition.

Further, plaintiff argues that because the injuries rendering her

disabled are orthopedic in nature, the Administrative Committee

should have weighed the opinion of Dr. Soojian, an orthopedic

surgeon, more heavily than that of Dr. Ambris, whose practice is

in physical medicine and rehabilitation.  Plaintiff also argues

that Dr. Soojian, as plaintiff's treating physician, was

motivated by his duty to cure or improve plaintiff's medical

condition, whereas Dr. Ambris operated under a conflict of

interest when he examined plaintiff because Delta paid him to

perform the examination.  Finally, plaintiff contends that Dr.

Ambris' opinion is unreliable because it conflicts with Nurse

Bidart's notes and recollection of the examination upon which Dr.

Ambris' opinion is based.  This last argument is based in large

---

[6] Plaintiff argues that Federal Rule of Evidence 702, which governs the admissibility of expert testimony in federal courts, should determine whether medical opinions may be considered during administrative review.  Pursuant to Federal Rule of Evidence 702 and case law, the reasoning or methodology underlying expert testimony must be scientifically valid and of the kind that may properly be applied to the relevant facts in order for such testimony to be admissible in federal courts.  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590-93 (1993).  Plaintiff provides no authority for her suggested application of Rule 702, and indeed, courts have declined to apply that Rule to evaluate the reliability of a physician's opinion as documented in an administrative record.  *See Robilotta v. Fleet Boston Fin. Corp. Group Disability Income Plan*, No. 05-CV-5284, 2008 WL 905883, at *14 (E.D.N.Y. Mar. 31, 2008) (rejecting same argument made with nearly identical language by same law firm).  Accordingly, I conclude that Rule 702 does not apply to the present situation.

part upon Dr. Ambris' statement in his report that "[plaintiff] has stated quite impressively that she is very interested in returning to work." Plaintiff contends that this statement mischaracterizes what she said to Dr. Ambris, as her full statement was that she would like to return to work if she could be pain free.

Plaintiff's arguments that Dr. Ambris' opinion is unreliable are unpersuasive. That Dr. Ambris was not plaintiff's treating physician has little import in the ERISA context,[7] and the fact that Dr. Ambris only examined plaintiff once does not, by itself, render his medical opinion unreliable. While it is true that Dr. Ambris is not an orthopedic surgeon, plaintiff has not explained how Dr. Ambris' professional training in physical medicine and rehabilitation renders him unfit to assess plaintiff's ability to perform work. In addition, defendants point out that plaintiff's conflict-of-interest argument with respect to Dr. Ambris applies with similar force to Dr. Soojian, who theoretically stands to benefit from a finding that plaintiff is disabled, since that determination would guarantee the availability of funds to pay Dr. Soojian for any future treatment plaintiff might require.

---

[7] In the context of Social Security disability determinations, special weight is accorded to the opinions of a claimant's treating physician. *See* 20 CFR §§ 404.1527(d)(2), 416.927(d)(2) (2002). The Supreme Court has made clear that the treating physician rule does not apply in the ERISA context. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-33 (U.S. 2003) (noting that "critical differences between the Social Security disability program and ERISA benefit plans caution against importing a treating physician rule from the former area into the latter").

Finally, the alleged inconsistencies between Dr. Ambris' report and Nurse Bidart's notes and recollection of the October 10, 2001 IME reveal nothing more than differing interpretations and conclusions based upon the same set of material facts. Dr. Ambris' approval of plaintiff's interest in returning to work does not imply that he discounted plaintiff's statement that she would like to return to work if she could be pain free; in fact, in a different portion of his report, Dr. Ambris notes that "[plaintiff] does express willingness to work *if she can be pain free*." AJW00137 (emphasis added). In addition, I note that Nurse Bidart's recollection of plaintiff's statement as set forth in Nurse Bidart's affidavit does not appear in the administrative record, and therefore need not have been taken into account by the Administrative Committee.[8]

---

[8] Plaintiff's arguments relating to other alleged inconsistencies between Dr. Ambris' report and Nurse Bidart's notes and affidavit fail for similar reasons. Specifically, plaintiff contends that Dr. Ambris omitted many of plaintiff's statements made during the examination and focused only on those statements that would be beneficial to Delta. The allegedly omitted statements include plaintiff's assertions that she needed help getting up from a seated position, needed help getting dressed, and had difficulty bearing weight on her left side while sitting. The record shows, however, that Dr. Ambris did report some of these statements. *See, e.g.*, AJW00135 ("[plaintiff] does have problems getting off the floor and sitting on the commode in the bathroom because of pain when trying to get up and to stoop down to the level of the commode"); AJW00141 ("[plaintiff] did demonstrate that sitting and bearing weight on the left side were occasionally uncomfortable for her"). In any case, Dr. Ambris was under no obligation to report the totality of plaintiff's statements verbatim in his report, and plaintiff has failed to show that Dr. Ambris omitted any particular statement in bad faith.

Plaintiff also argues that Dr. Ambris unfairly mischaracterized her statements concerning her ability to walk. In his report, Dr. Ambris noted that "[i]n her ambulation [plaintiff] has managed approximately two blocks, being able to walk just halfway around the total circumference of her block over the last two weeks. She uses a cane and manages satisfactorily; however, the pain limits her distance." AJW00136. According to Nurse Bidart's notes, however, when Dr. Ambris asked plaintiff how many blocks she could walk,

In addition to addressing plaintiff's arguments relating to
the reliability of Dr. Ambris' opinion, defendants also set forth
two additional reasons why the Administrative Committee's
decision to accord more weight to Dr. Ambris' opinion than to Dr.
Soojian's opinion was appropriate.  First, Dr. Ambris' opinion
was based on an October 10, 2001 examination, which appears to
have been plaintiff's most recent examination at the time of the
Administrative Committee's September 2002 decision.  By contrast,
Dr. Soojian's opinion relates back to his May 6, 1999 examination
of plaintiff.  Second, while Dr. Ambris' report made clear that
his opinion was based upon the Disability Plan's definition of
"disabled," it is unclear what definition of "disabled" Dr.
Soojian based his opinion on.  In light of these arguments, as
well as other considerations set forth above, I conclude that the
Administrative Committee's decision to accord more weight to Dr.
Ambris' opinion than to Dr. Soojian's opinion, which led the

---

plaintiff said she did not know.  AJW00101.  When Dr. Ambris asked if in the
last two weeks, plaintiff had been able to go to the end of her block,
plaintiff replied, "[h]alf way . . . other half would be exhausted . . .
someone would have to pull or push me back."  *Id*.  I find that the record does
not show that Dr. Ambris' statement concerning the distance which plaintiff
could walk -- if indeed it was inaccurate -- was materially false.  In
addition, plaintiff complains that Dr. Ambris unfairly mischaracterized her
gait as "safe," apparently because plaintiff uses a cane.  However, Dr. Ambris
did note that plaintiff's gait was "antalgic" (meaning that plaintiff limps
while walking), and Dr. Ambris' opinion that plaintiff's gait was "safe" is
not refuted by the mere fact that plaintiff uses a cane.
     Finally, plaintiff points out that while Dr. Ambris stated that the
examination took one and a half hours, according to plaintiff and Nurse
Bidart, the examination only took one hour.  This discrepancy is immaterial.
Even if plaintiff and Nurse Bidart are correct, a one-hour examination is not
by definition cursory or inadequate, such that reliance on an opinion based on
a one-hour examination is necessarily arbitrary or capricious.

Committee to conclude that plaintiff was not disabled within the meaning of the Disability Plan, was neither arbitrary nor capricious.

2.   *The Administrative Committee's Alleged Failure to Consider Vocational Aspects of Plaintiff's Claim*

Plaintiff also argues that the Administrative Committee's decision was arbitrary and capricious because the Committee failed to consider plaintiff's age, education, work history and available jobs in determining that plaintiff was not totally disabled.  In support of her argument, plaintiff cites *Mood v. Prudential Ins. Co. of Am.*, 379 F. Supp. 2d 267 (E.D.N.Y. 2005), and *Austin v. Cont'l Cas. Co.*, 216 F. Supp. 2d 550 (W.D.N.C. 2002).  The *Mood* and *Austin* courts required plan administrators to consider these factors in determining whether the plaintiffs in those cases were disabled.  *Mood*, 379 F. Supp. 2d at 281; *Austin*, 216 F. Supp. 2d at 559.  As defendants point out, however, the disability plans at issue in *Austin* and *Mood* required consideration of vocational evidence by their terms. *Mood*, 379 F. Supp. 2d at 272 (defining disabled as being "unable to perform the duties of any gainful occupation for which [the participant is] reasonably fitted by education, training or experience"); *Austin*, 216 F. Supp. 2d at 555 (defining disabled as being "unable to engage in any occupation for which [a participant] was or became qualified based on her education, training, and experience").  Where a benefit plan does not

address vocational circumstances to be taken into account in determining disability status, consideration of such circumstances is left to the discretion of the plan administrator. *Demirovic v. Bldg. Servs. 32 B-J Pension Fund*, 467 F.3d 208, 215 (2d Cir. 2006) ("Where, as here, the plan is silent on the issue of non-medical vocational characteristics, the nature of this consideration will be within the plan administrators' broad discretion, and may vary from case to case"). Here, the Disability Plan is silent on the issue of vocational circumstances, and accordingly, the Committee has broad discretion as to how to consider such evidence.

The administrative record documenting this aspect of the Committee's deliberations is thin. Plaintiff submitted no evidence to the Disability Plan that she lacked vocational skills to perform any kind of work, and the Administrative Committee did not expressly discuss plaintiff's vocational circumstances in its decision. At a minimum, however, the record does show that the Committee considered and agreed with Dr. Ambris' opinion that plaintiff was able to perform clerical work, even though plaintiff had been out of work for a considerable length of time and might be initially lacking in self-confidence on the job. AJW00007. While this determination doubtlessly could have been supplemented by a more substantial consideration of plaintiff's vocational circumstances, given the silence of the Disability

Plan on this issue, the Committee's determination falls within its discretion and does not rise to the level of an arbitrary or capricious decision.

3.  *The Administrative Committee's Alleged Failure to Reconcile its Decision with Plaintiff's Social Security Disability Award*

Next, plaintiff argues that the Administrative Committee did not give adequate weight to the Social Security Administration ("SSA")'s determination that plaintiff is disabled.  The record reflects the Administrative Committee's consideration of plaintiff's SSA disability benefits award, as well as plaintiff's argument that because the SSA and the Disability Plan had, according to plaintiff, "virtually identical" definitions of "disability," the Disability Plan should have granted disability benefits to plaintiff because the SSA determined that plaintiff was disabled.  The Administrative Committee considered and rejected this argument, stating:

> [T]he Committee disagrees with your assertion that the social security definition and the [Disability] Plan's definition of disability are virtually identical.  The Plan's definition is more difficult to satisfy.  As an example, if one is able to engage in part-time work, even if that work is markedly different than the work that a person engaged it [sic], even if that work requires different skills, and even if it would pay much less money, one is not qualified for benefits under the terms of the Plan.  The result can be much different under social security.

AJW00013.

In her submissions to this Court, plaintiff raises new arguments in support of her position that the Committee did not

give adequate weight to her SSA award.  First, plaintiff points
to a settlement agreement between UNUM Provident Corporation and
the Department of Labor (the "DOL"), in which UNUM agreed to give
"significant weight to evidence of an award of Social Security
disability benefits as supporting a finding of disability,"
absent certain exceptions, in handling claims for disability
benefits.  Pl.'s Memo. at 19.  Plaintiff contends that the UNUM
settlement is evidence that the DOL -- which is one of the
entities primarily responsible for the enforcement and
administration of ERISA, *see* 29 U.S.C. §§ 1132(a)(5), 1135 --
expects all employee benefit plans to accord significant weight
to SSA determinations.  As defendants point out, however, were
this really the case, the DOL would simply promulgate a
regulation applicable to all employee benefit plans compelling
them to accord significant weight to SSA determinations.  *See*
*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003)
(noting the absence of a DOL regulation imposing the treating
physician rule for ERISA purposes in concluding that treating
physician rule is inapplicable in the ERISA context); 29 U.S.C. §
1135.  In the absence of such a regulation, I decline to
speculate on the DOL's position regarding the weight due to SSA
disability determinations.

Plaintiff also points to the fact that under the Disability
Plan, Delta disability benefits are reduced by the amount a

Disability Plan claimant receives or is entitled to receive from the SSA.  Pl.'s Memo. at 19.  It is unclear how this Plan provision relates to plaintiff's argument that the Administrative Committee did not adequately consider her SSA award.  Although plaintiff argues that the provision implies that the Disability Plan "should not be permitted to simply ignore the SSA's findings," Pl.'s Memo. at 19, it is clear that the Administrative Committee did not ignore plaintiff's SSA award in this case.  *See supra.*  Considered together, plaintiff's arguments do not lead me to conclude that the Administrative Committee's consideration of plaintiff's SSA award was arbitrary or capricious.

*4.    Plaintiff's Status as "Under the Care of a Physician"*

Finally, plaintiff argues that the Administrative Committee's determination that plaintiff was not under the care of a physician for her disability was arbitrary and capricious. According to the Disability Plan, in order for a disabled employee to receive disability benefits, the employee must be "under the care of a physician or surgeon for the injury . . . which is the disabling condition." 86DP043.  The Plan does not define the term "under the care," nor does it indicate how often the employee must visit her physician or surgeon.  In the absence of such clarification, the interpretation of the "under the care" requirement is left to the reasonable discretion of the Administrative Committee.  86DP072; *Pagan v. NYNEX Pension Plan*,

52 F.3d 438, 441 (2d Cir. 1995).

*i.  Plaintiff's Argument That She Was Under the Care of Dr. Soojian after May 31, 1999*

Plaintiff argues that although she may not have visited her treating physician, Dr. Soojian, as regularly as the Administrative Committee would have liked, she was nevertheless under his care after May 31, 1999 for her disabling conditions. In support of her argument, plaintiff points to Dr. Soojian's December 27, 1999 statement to the New York Office of Temporary and Disability Insurance, in which he noted her limitations and concluded she was "totally disabled."  AJW00162-64.  She also points to "office notes" from Dr. Soojian dated February 1, 2001 and June 28, 2001.  AJW00165.  Plaintiff contends that the office notes are records of actual office visits, as they contain information that purportedly could only be ascertained by physical examination.  Finally, plaintiff points to Dr. Soojian's statement in a letter dated January 21, 2002, that plaintiff had "been continuously under [his] care since May 3, 1994 up to and including the present."  AJW00049-50.  In light of these records, plaintiff contends that the Administrative Committee's decision that she was not under the care of a physician for her disability after May 31, 1999 was unreasonable.[9]

---

[9] Plaintiff also points out that the Administrative Record shows that she was under the care of two other doctors from 1999-2001.  Pl.'s Memo. at 21; AJW00209-226; AJW00166-184.  However, these doctors were not treating plaintiff for the injuries which constituted her disabling condition, as required by the terms of the Disability Plan.  86DP043.  Therefore, these

In response, defendants point out that Dr. Soojian himself admitted in his January 21, 2002 letter that prior to the Administrative Committee's decision in September 2002, he had last examined plaintiff on May 6, 1999. AJW00049. Therefore, according to defendants, Dr. Soojian's 2001 office notes could not have corresponded to physical examinations of plaintiff. Plaintiff counters that Dr. Soojian was simply mistaken when he wrote that his last examination of plaintiff was on May 6, 1999. Plaintiff's Reply Memorandum of Law in Further Support of Her Motion for Summary Judgment ("Pl.'s Reply Memo.") at 2. According to plaintiff, the office notes recite observations that allegedly only could have been made by contemporaneous examination. These observations included noting that plaintiff's scar was "well healed," that the range of motion of her right knee was 0-100 degrees with increased pain, and the range of motion of her left knee was 0-120 degrees with medial joint line pain. AJW00165.

It is undisputed, however, that at the time of its September 2002 decision, the Administrative Committee had before it both the 2001 Soojian office notes and the January 21, 2002 statement by Dr. Soojian that he had not physically examined plaintiff since May 6, 1999. The administrative record does not reflect

---

treatment records are irrelevant for the purposes of the "under the care" requirement.

any further argument or clarification as to whether the office
notes corresponded to physical examinations of plaintiff, or
whether Dr. Soojian's January 21, 2002 statement was correct.
The office notes do not, by themselves, prove that Dr. Soojian's
statement was incorrect.  It is entirely possible that the notes
were recorded as a courtesy to plaintiff, or that they reflect a
doctor-patient phone conversation rather than a physical
examination of plaintiff.  Regardless, the Administrative
Committee's conclusion that plaintiff had not been seen or
treated by Dr. Soojian since May 6, 1999 was a reasonable
interpretation of a somewhat ambiguous record.  Therefore, the
Committee's decision that plaintiff was not under the care of a
physician for her disability after May 31, 1999 was not arbitrary
or capricious.[10]

ii. *Plaintiff's Argument That Financial Hardship Prevented Her*
    *From Seeking More Frequent Treatment*

        In the alternative, plaintiff argues that even if she was
not under the care of a physician after May 31, 1999, the
Administrative Committee should have excused this circumstance
due to plaintiff's financial hardship and inability to pay for
medical treatment.  Plaintiff contends that the reduced frequency

---

[10] Plaintiff also contends that even if there was a lapse in plaintiff's
treatment for her disability, assuming plaintiff was otherwise eligible for
disability benefits, defendants would only be excused from providing plaintiff
with benefits for the time period when she was not under the care of a
physician.  Because I conclude that the Administrative Committee's independent
decision that plaintiff was not disabled within the meaning of the plan was
not arbitrary or capricious, however, I need not consider this argument.

of her visits to her orthopedist, Dr. Soojian, was the direct
result of the Disability Plan's first decision to terminate her
disability benefits, which cut off a substantial portion of her
income as well as her medical insurance.  Plaintiff does not
dispute the fact that after the Administrative Committee reversed
the initial denial of benefits, she received over $56,000.00 from
the Disability Plan -- but points out that she did not receive
these funds until February of 2001.  Before that time, plaintiff
contends that her only income was from her SSA disability award
and Medicare, which was not enough for plaintiff to seek all of
the medical care she needed.  Plaintiff was forced to prioritize
certain treatments in 2000, at which time she maintains that her
high glucose levels and gynecological issues, including a left
breast mass, took precedence over her disabling injuries.  Pl.'s
Memo at 5.  Thus, according to plaintiff, financial hardship was
the reason she did not seek treatment for her disabling injuries
after May of 1999.

Plaintiff cites several cases in support of her argument
that financial hardship may excuse compliance with a requirement
that a disability benefits claimant be under the care of a
physician for her disabling injuries.[11]  With one exception,

---

[11] Specifically, plaintiff cites *Sullivan v. North Am. Accident Ins.
Co.*, 150 A.2d 467, 472 (D.C. App. 1959) (stating that inability to afford
expense of treatment is valid reason to excuse failure to submit to regular
attendance and treatment by doctor); *Lovejoy v. Heckler*, 790 F.2d 1114, 1117
(4th Cir. 1986) ("A claimant may not be penalized for failing to seek
treatment she cannot afford"); *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th

these cases are drawn from the Social Security context,[12] and generally take the view that "[i]t flies in the face of the patent purpose of the Social Security Act to deny benefits to someone because he is too poor to obtain treatment that may help him." *Lovejoy*, 790 F.2d at 1117. Plaintiff contends that this reasoning is applicable in the ERISA context as well. However, plaintiff does not explain why this reasoning should apply in ERISA cases, despite the "critical differences" between the Social Security and ERISA statutory regimes. *Black & Decker*, 538 U.S. at 233.

For several reasons, I conclude that the cases cited by plaintiff are inapposite. By definition, Social Security claimants are not receiving disability benefits or Medicare[13] at the time they make a disability claim, as they must first obtain a disability award in order to receive those benefits. Thus, financial hardship is often relevant in the Social Security context. In this case, however, as well as in other ERISA cases,

---

Cir. 1988) (stating that poverty excuses noncompliance with treatment); *Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) ("the [administrative law judge] must consider a claimant's allegation that he has not sought treatment or used medication because of lack of finances"); and *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("To a poor person, a medicine that he cannot afford to buy does not exist").

[12] Unlike the other cases cited by plaintiff, *Sullivan v. North Am. Accident Ins. Co.* is a private insurance rather than a Social Security case. 150 A.2d 467 (D.C. App. 1959). However, because the *Sullivan* case was decided 15 years prior to the enactment of ERISA, it is not binding on an ERISA claim.

[13] 42 C.F.R. § 406.12 provides that individuals under the age of 65 are entitled to Medicare on the basis of a SSA disability award.

plaintiff was already receiving disability and Medicare benefits
as a result of her SSA award at the time that she was not under
medical care for her disabling injuries.  Although plaintiff
contends that her Social Security income was insufficient for her
to seek all of the medical treatment she needed, the fact remains
that unlike a Social Security claimant without private insurance,
she was at least receiving some disability benefits at the time
she was not under the care of a physician for her disabling
injuries.

Further, even assuming arguendo that the financial hardship
argument is appropriate in the ERISA context, the cases cited by
plaintiff are distinguishable on their facts.  The four Social
Security cases on which plaintiff relies held that it was error
to consider the failure to follow a prescribed course of
treatment or seek medical treatment as evidence that a claimant
was not disabled, without considering whether the claimant was
able to afford such treatment.  *Lovejoy*, 790 F.2d at 1117;
Dawkins, 484 F.2d at 1214; *Dover*, 784 F.2d at 337; *Lovelace*, 813
F.2d 59.  In this case, the Administrative Committee did not
consider plaintiff's failure to remain under the care of a
physician for her disability as evidence that she was not
disabled.  Rather, the Committee's determination that plaintiff
was not disabled within the meaning of the Disability Plan was
independent from its determination that plaintiff was not under

the care of a physician for her disability after May 31, 1999, as the plan requires.  AJW00013.

I am not unsympathetic to the difficult choices plaintiff must make regarding medical treatment in light of her limited financial resources.  However, the Administrative Committee expressly considered plaintiff's financial hardship in its decision to deny her benefits.  *See* AJW00005.  Plaintiff's arguments as set forth *supra* do not persuade me that the Committee's determination that plaintiff's financial difficulty did not excuse her from complying with the Disability Plan's requirement that she remain under the care of a physician for her disabling injuries was arbitrary or capricious.

iii. *Plaintiff's Argument That More Frequent Treatment Would Have Been Futile*

Finally, plaintiff contends that even if she was not under the care of a physician after May 31, 1999, the Administrative Committee should have excused this circumstance because further treatment of her disabling injuries would have been futile. Plaintiff states that she was advised by Dr. Soojian that she had reached "maximum medical improvement," meaning that further treatment would not significantly improve her condition.  Pl.'s Aff. ¶ 42.  However, plaintiff does not identify any portion of the administrative record where this medical opinion was conveyed to the Administrative Committee prior to its September 2002 benefits decision.  Instead, plaintiff argues that this

conclusion was apparent from Dr. Soojian's statement in his January 21, 2002 report that "resolution of [plaintiff's] symptoms is not anticipated." AJW00083. I find, however, that this statement does not necessarily imply that further treatment of plaintiff would be futile. Indeed, in the same report, Dr. Soojian indicated that plaintiff would "ultimately require a left total knee replacement in the near future." *Id.* No reasonable juror could find that the record evidence, viewed in the light most favorable to plaintiff, establishes that further treatment of plaintiff would be futile. Therefore, plaintiff's argument that the Advisory Committee arbitrarily and capriciously refused to excuse her non-compliance with the requirement that she remain under the care of a physician for her disability fails.

## CONCLUSION

For the reasons set forth above, summary judgment is granted in defendants' favor. The Clerk is hereby directed to transmit a copy of the within to the parties and the Magistrate Judge.


SO ORDERED.

Dated:     Brooklyn, NY
           January 6, 2009

                    By: /s/ Charles P. Sifton (electronically signed)
                    United States District Judge